UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 07-10146-RWZ

UNITED STATES OF AMERICA

v.

MICHAEL A. SICILIANO

MEMORANDUM OF DECISION AND ORDER

March 14, 2008

ZOBEL, D.J.

Defendant Michael A. Siciliano ("Siciliano") is charged with one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B); one count of attempt to manufacture 3,4-Methylenedioxymethamphetamine ("MDMA") in violation of 21 U.S.C. § 846; one count of maintaining drug-involved premises in violation of 21 U.S.C. § 856(a)(1); and two counts of criminal forfeiture pursuant to 21 U.S.C. § 2253 and 21 U.S.C. § 853.  He has moved to suppress (1) all evidence seized from his residence on November 16, 2006; and (2) all evidence seized from his computers during subsequent searches by federal law enforcement personnel.  Based on the parties' motion papers and after an evidentiary hearing, I find the following facts.

**I.    Findings of Fact**

   **A. The Initial Investigation**

In 2006, Special Agents of the United States Drug Enforcement Administration ("DEA") began investigating Siciliano in response to information obtained from the

Royal Canadian Mounted Police ("RCMP").  The RCMP advised the DEA agents that in February 2005 Siciliano and another individual had ordered chemicals used in manufacturing MDMA from a Canadian company and received those chemicals at 85 Surrey Street in Brighton, Massachusetts.  The DEA issued an administrative subpoena to eBay Inc. for the transaction history on an account registered to Siciliano and which listed his address as 85 Surrey Street # 1.  In response the DEA received a transaction log of purchases from June 2002 through August 2006 which included various chemicals, glassware and other equipment, all of which were sent to 85 Surrey Street # 1.  According to DEA Special Agent Anthony Roberto ("Roberto"), the co-case agent, the chemicals and glassware purchased are used in manufacturing MDMA.  In October 2006, Roberto surveilled defendant on one occasion, following him from 85 Surrey Street to Northeastern University.  Roberto also went through defendant's trash in October 2006 and found a financial statement with defendant's name and the 85 Surrey Street # 1 address.

### B.  The Events of November 16, 2006

On November 16, 2006, at approximately 9:00 a.m., Roberto and another DEA Special Agent, David DiTulio ("DiTulio") went to the apartment at 85 Surrey Street # 1 and knocked on the door.  Both agents were dressed in plain clothes.  Roberto carried his DEA badge on his belt, while DiTulio wore his on a chain around his neck.  Siciliano opened the door, the agents identified themselves and asked if he was Michael Siciliano.  Defendant first denied his identity, then admitted it after Roberto confronted him with a copy of his driver's license photo.  Roberto told Siciliano that he and DiTulio

wished to ask him some questions, at which point Siciliano told the agents they could come in. Siciliano refutes both that the agents identified themselves and that he invited them into the apartment. I credit the agents' testimony on this issue.

Roberto testified that he did not fear for his safety while in the doorway of the apartment. He and DiTulio entered the residence, with Roberto and DiTulio in that order following Siciliano down a hallway towards the kitchen. Mid-way to the kitchen DiTulio turned around and left the apartment. He went to the front porch and waived to four other law enforcement personnel who were waiting in their cars on the street to come over.[1] DiTulio told them that Siciliano would speak to "us" and that they could enter the apartment. However, DiTulio had not mentioned the other four officers to Siciliano and had not asked him whether they, too, could go into the apartment.

All of the officers went in and conducted a brief protective sweep of the apartment while Roberto continued to speak with Siciliano in the kitchen.[2] Three of the officers, including DiTulio, started in the front of the apartment while the remaining two officers went to the rear. DiTulio and Detective Guy went to the first doorway on the

---

[1] The law enforcement personnel were Boston Police Detective Kevin M. Guy, Boston Police Detective James Fitzpatrick, DEA Group Supervisor Jonathan Schleffer, and Task Force Officer Martin O'Malley. For simplicity the court will refer to them collectively as "officers."

[2] The apartment has one central hallway with doorways on both sides. Upon entering the apartment via the front door, at least two bedrooms and stairs to the basement are off the hallway. The hallway ultimately leads to the living room, and the kitchen and a room used as an office are off the living room. A final bedroom is located in the back of the apartment off the kitchen.

left, which led to Siciliano's bedroom.[3] The bottom drawer of a dresser was open, and DiTulio observed a package containing empty gelatin capsules. DiTulio also saw a small refrigerator, but did not open it. Group Supervisor Schleffer observed a plastic bag containing powder in the office. The powder was not field-tested. The officials searching the rear of the apartment found another individual, one of Siciliano's roommates, in the bedroom off the kitchen. The officers did not find the basement. DiTulio admitted that there was not one specific factor which necessitated a protective sweep of the apartment but that he felt protective sweeps were generally a good idea whenever officers had to enter an unknown situation.

As they were walking toward the kitchen Roberto asked Siciliano if anyone else was in the apartment. Siciliano first replied there was not, then stated he wasn't sure and did not know.[4] Roberto then specified that he wanted to speak with Siciliano about orders of chemicals. Siciliano claimed he had not ordered any. Roberto insisted that Siciliano had ordered chemicals and glassware, which Siciliano again denied. Roberto had brought the eBay transaction log with him and told Siciliano that he had a list of his purchases. Siciliano then said that the purchases occurred six years ago. When Roberto replied that he had purchased the items more recently, Siciliano responded that the purchases were four years ago. At this point in the conversation the other

---

[3] Both agents testified that they did not have any knowledge regarding the layout of the apartment, the number of bedrooms, or the number of individuals living in the apartment prior to that day.

[4] As discussed infra, I find that this exchange occurred between Roberto and Siciliano after DiTulio left to summon the other officers.

officers had completed the protective sweep and congregated in the kitchen with Roberto and Siciliano, and Roberto continued to ask questions. Roberto again replied that the purchases had occurred more recently, and Siciliano stated that he had ordered the items for "Frank," someone he knew from Northeastern University. Roberto asked defendant who "Frank" was, including his last name, phone number, and address, and defendant said he did not know any of these details. Siciliano's demeanor became more hostile during the course of the exchange, and he began yelling and pushed Roberto. Roberto asked Siciliano for consent to search the apartment, which Siciliano denied. Everyone, including Siciliano, then left. Defendant said that he wished to call an attorney and his mother and apparently did so within earshot of Roberto. The latter heard defendant state on the phone that he had done something stupid and ordered chemicals.

Roberto and DiTulio both testified that they decided to freeze the apartment and seek a warrant partly because of Siciliano's answers to their questions and partly because of what had been observed during the protective sweep. They departed with Detectives Guy and Fitzpatrick to obtain a warrant. The other officers remained outside the apartment to keep it "frozen" pending the issuance of the warrant.

Detective Guy submitted an affidavit in support of the application for a warrant. He set forth the following: (1) information obtained from the RCMP;[5] (2) a list of the

---

[5] The affidavit erroneously stated that the RCMP told the DEA that Siciliano ordered and received one-half kilogram of P-Benzoquinone, a chemical used in manufacturing MDMA. In fact, Roberto testified that the RCMP told the DEA that Siciliano had purchased other MDMA precursors but not P-Benzoquinone. Its inclusion in the affidavit was an error attributable to Roberto's use of a model document from

5

purchases made on eBay; (3) Siciliano's evasive responses to questions concerning his identity and whether others were in the apartment; (4) the gel capsules and powder viewed during the protective sweep; (5) Siciliano's responses to Roberto's questions concerning his purchase of chemicals; (6) Siciliano's overheard telephone conversation; and (7) Siciliano's evasive and agitated demeanor.  The request sought permission to search for and seize (1) MDMA "and any monies, records, articles, instruments or paraphernalia used in the cutting, weighing, packaging and bagging of controlled substances;" (2) "any electronic equipment used to facilitate the manufacture and distribution of a controlled substance;" (3) "any keys and or [*sic*] personal papers showing ownership or control" of the apartment; and (4) "any monies relating to the sales of a controlled substance."  (Docket # 17-2.)  The Assistant Clerk Magistrate in the Brookline Division of the Boston Municipal Court issued the search warrant.

In the course of the search the officers found 1.3 grams of 82% pure MDMA in Siciliano's bedroom along with a digital scale, plastic baggies, a plastic spatula and the gelatin capsules observed during the protective sweep.  In the office area next to two computers they found documents which appeared to be computer printouts.  The documents contained pictures and text describing how to manufacture MDMA.  In the basement they found chemicals and glassware consistent with the manufacture of MDMA.  After the search was completed the officers arrested Siciliano on state charges of possession with intent to distribute controlled substances.  They seized, inter alia, the two computers and a small drive ("jump drive") attached to one of the computers.

---

another case.

**C. The March 2007 Warrants**

On March 8, 2007, Roberto applied for a federal warrant to search the two computers and jump drive for records constituting evidence of the illegal manufacture and distribution of controlled substances. The warrant was signed the same day, and on March 9, 2007, the computers and jump drive were sent to the DEA's Digital Forensic Laboratory for analysis. DEA Computer Forensic Examiner Jill Mossman ("Mossman"), assigned to search the computers and jump drive, observed during the course of her examination several file names which she believed might be child pornography. She stopped the examination and notified her manager, who advised her to notify Roberto. Mossman e-mailed Roberto that if he wanted to pursue a child pornography investigation he would need an updated warrant. Roberto contacted the Assistant United States Attorney ("AUSA") assigned to the case for guidance on how to proceed. At the AUSA's direction, Roberto asked Mossman for more detailed information about the file names she had observed. Mossman replied that she had identified over ten files with names such as "young girl," "preteen," "lolita," "16 yr old and 17 yr old," and "rape." (Ex. 27.) She also created a rough count of active and deleted suspect file names but did not open any of the files.

Mossman also conducted a file-by-file "hash" of the hard drive. She explained that the process of "hashing" files involves applying a mathematical algorithm to each file to create a "hash value" for each file. The hash value is similar to a digital fingerprint in that each file has a unique hash value and whenever a file is altered its hash value is also altered. Hashing files is part of DEA protocol and is done in every

7

case, and if the hash values of two files match the files are identical.  The DEA uses a computer software program called EnCase which allows the user to image a hard drive and examine its contents.  She used the program to obtain the hash values for all of the files on the first computer ("N16").  EnCase has a hash value library that contains the hash values for various known files, such as certain viruses and system files.  The library also contains a compilation of hash values for known child pornography files known as the "Innocent Images" hash set.  These files are compiled by law enforcement personnel trained as experts in child pornography.  While some of the files have been adjudicated and determined to be child pornography, others are included because the law enforcement personnel believe them to be child pornography.

   Mossman compared the hash values of the files on N16 with the hash values from EnCase's library of known child pornography files and found five files with matching hash values.  When she advised Roberto of the results of her analysis, Roberto, acting pursuant to the AUSA's advice, directed her to open one file, print the image and send it to him.  She did so with a file titled, "lolita 2 8yo girls nude (2)."  Mossman followed the same procedures for the second computer ("N17") and found three files whose hash values had a match in the known child pornography library.  Again she opened one such file, titled, "younger sister's friend naked . . . qwerty very illegal pretee," printed the image, and sent it to Roberto along with the image printed from N16.  Roberto attached the printed images to his request for an updated warrant to search the two hard drives for all records constituting evidence, fruits, and/or instrumentalities of the transportation, receipt or possession of child pornography.  (Ex.

22.)  The warrant was signed by a magistrate judge on March 29, 2007.  (Id.)

## II.     Conclusions of Law

### A.  Consent to Enter

The Supreme Court has afforded the greatest Fourth Amendment protection to the home.  See Payton v. New York, 445 U.S. 573, 589-90 (1980) ("the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed") (internal quotation marks and citation omitted).  Nonetheless, warrantless entry into the home is permissible when police obtain the voluntary consent of the occupant.  See Georgia v. Randolph, 547 U.S. 103, 106 (2006).  It is the government's burden to show by a preponderance of the evidence that Siciliano consented to entry and that such consent was freely and voluntarily given.  Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1972).  I find that the government has met its burden.  Roberto's and DiTulio's testimony on this point is both consistent and credible, and the fact that Siciliano led Roberto to the kitchen at the back of the apartment, and answered Roberto's questions, further evidences his consent to their entry.

However, the entry by the other officers waiting outside raises different issues.  "[T]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  Florida v. Jimeno, 500 U.S. 248, 251 (1991).  The government asserts that Siciliano's consent to Roberto's and DiTulio's entry extended to the four other officers who participated in the protective sweep.  Yet, those officers were hidden from view in their

9

cars on the street and were never mentioned by either Roberto or DiTulio; there is no evidence that Siciliano knew they were even present.  While Siciliano during the initial conversation clearly and explicitly authorized Roberto and DiTulio to come in, it is equally clear that he invited only those two.  Given the limited purpose of the entry – to ask questions – and given that the others were never mentioned and Siciliano never saw them, no reasonable person would conclude that the invitation also extended to them.  Accordingly, their entry into the apartment violated the Fourth Amendment.

### B. Protective Sweep

Moreover, the protective sweep was unjustified.  In <u>Maryland v. Buie</u>, 494 U.S. 325 (1990), the Supreme Court stated:

> We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.  Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

<u>Id.</u> at 334.  The Court permitted the protective sweep in <u>Buie</u> because of the compelling "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack," emphasizing that the intrusion allows only a "cursory inspection of those spaces where a person may be found."  <u>Id.</u> at 335; <u>see also</u> <u>Michigan v. Long</u>, 463 U.S. 1032, 1049-50 (1983) (searching officer must possess a "reasonable belief" based on "specific and articulable

10

facts" and rational inferences from those facts that area swept may harbor an individual posing a danger).[6]

The reasonable belief that would justify a protective sweep "is an objective standard; its existence centers upon the objective significance of the particular facts under all the circumstances. That standard is considerably less demanding than the level of proof required to support a finding of probable cause." United States v. Martins, 413 F.3d 139, 149 (1st Cir. 2005) (internal quotation marks and citation omitted). In undertaking this analysis, "the experienced perceptions of law enforcement agents deserve deference and constitute a factor" for the court to consider. United States v. Winston, 444 F.3d 115, 119 (1st Cir. 2006). Nonetheless, the suspicion of danger must be based on more than unfounded speculation. United States v. Cook, 277 F.3d 82, 85 (1st Cir. 2002).

The government attempts to justify the protective sweep on two grounds. First, it argues that the officers knew chemicals had been delivered to the apartment and suspected it might be the site of an MDMA manufacturing laboratory. Not knowing how many people might be inside the apartment, they feared an unknown individual might be present who would create a danger either intentionally or unintentionally in attempting to dispose of the chemicals. However, this is precisely the sort of

---

[6] Although Buie only addressed protective sweeps made incident to arrests, the First Circuit has extended the doctrine to instances where police lawfully enter a residence pursuant to a search warrant or exigent circumstances. United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005) (also approvingly citing cases in which protective sweeps were found justified pursuant to consensual entry into the residence).

unfounded speculation which fails to pass muster.  Roberto and DiTulio did not view anyone else entering or leaving the apartment in their surveillance that morning or on an earlier occasion.  They had no knowledge that defendant was likely to be armed or that he had a history of violence, nor did they know or have reason to suspect that anyone else was in the apartment who was likely to be armed or otherwise dangerous. Permitting a protective sweep based upon the mere suspicion that there may be more people inside the apartment, without any articulable basis for this suspicion, extends the protective sweep doctrine past its breaking point.  Furthermore, although the chemicals and glassware previously delivered to the apartment might be used in manufacturing MDMA, simply possessing them is not illegal and by itself cannot raise a reasonable belief of danger, particularly when the last known delivery had occurred more than two months earlier and neither officer smelled chemicals when entering the apartment or had any other indication of their use.  Finally and most critically, Roberto, a DEA agent with over twenty-seven years of experience, testified that he was not concerned for his safety when he entered the apartment.

Second, the government argues that Siciliano's evasive answers to Roberto's question about other people in the apartment (first answering, "no," then stating "I'm not sure," and "I don't know") raised the officers' suspicions that someone else might be present.  However, even if these answers could raise reasonable suspicion, they were only heard by Roberto, who did not direct the sweep.  Although there is some suggestion that DiTulio was present for this conversation, he testified that he did not recall any conversation between Roberto and Siciliano while in the hallway, permitting

12

the inference, which I draw, that he had already turned around to summon the other officers when the exchange occurred. Accordingly, the decision to conduct the sweep could not have been based on Siciliano's evasive answers regarding other occupants.

### C. United States v. Dessesaure

In United States v. Dessesaure, 429 F.3d 359 (1st Cir. 2005), officers obtained a search warrant based in part upon items which they had seen during an illegal entry into a residence. In determining whether to suppress the evidence found pursuant to the warrant the First Circuit set forth a two-part analysis derived from Franks v. Delaware, 438 U.S. 154 (1978), and Murray v. United States, 487 U.S. 533 (1988). First, the reviewing court "must excise the offending information [from the warrant affidavit] and evaluate whether what remains is sufficient to establish probable cause." Dessesaure, 429 F.3d at 367. Second, the court must determine whether the warrant would have been sought even if the illegal entry had not occurred. Id. at 369.

#### 1. Probable Cause

"Probable cause to issue a search warrant exists when 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Reiner, 500 F.3d 10, 15 (1st Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). A court examining the sufficiency of an affidavit supporting a search warrant must consider whether the "totality of the circumstances" stated in the affidavit demonstrates probable cause to search the premises. Id. "[N]ormally the warrant application must demonstrate probable cause to believe that a particular person has committed a crime

13

– the commission element – and that enumerated evidence relevant to the probable criminality likely is located at the place to be searched – the nexus element." United States v. Zayas-Diaz, 95 F.3d 105, 110-11 (1st Cir. 1996) (internal quotation marks and citations omitted).

### a. Staleness

Defendant argues that the information in the affidavit regarding the eBay purchases was too stale to establish probable cause. The ten purchases on eBay occurred over a two and one-half year period, with three purchases in January 2004 (a vacuum gauge, ephedrine, and a hot plate/stirrer), two purchases in July and August 2005 (a gem scale and silica gel), one purchase in December 2005 (64 ounces of sassafras oil), and three purchases in July and August 2006 (potassium bromide, vacuum pump oil, and sodium hydroxide).[7] (See Docket # 17-2, 4-5.) The last purchase occurred on August 26, 2006, nearly two and one-half months prior to the application for a search warrant on November 16, 2006.

The First Circuit applies four factors to determine whether information is stale: "(1) the nature of the suspected criminal activity (discrete crime or regenerating conspiracy), (2) the habits of the suspected criminal (nomadic or entrenched), (3) the character of the items to be seized (perishable or of enduring utility), and (4) the nature and function of the premises to be searched (mere criminal forum or secure operational base)." United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992) (internal

---

[7] The affidavit also lists the purchase of a beaker set from eBay but does not include a date. (See Docket # 17-2, 5.) However, the list of purchases appears to be chronological, suggesting that the beaker set was purchased in August 2006. (Id.)

14

quotation marks and citations omitted), <u>abrogated on other grounds by</u> <u>Cleveland v. United States</u>, 531 U.S. 12 (2000).

Here, the suspected activity – drug manufacturing – is one which is ongoing in nature.  <u>See</u> <u>United States v. Schaefer</u>, 87 F.3d 562, 568 (1st Cir. 1996); <u>United States v. Hershenow</u>, 680 F.2d 847, 853 (1st Cir. 1982) ("Where the information points to illegal activity of a continuous nature, the passage of several months between the observations in the affidavit and the issuance of the warrant will not render the information stale.").  The apartment was both Siciliano's residence and the location where the eBay purchases were delivered, rendering it more likely that the items would be on the premises.  <u>See</u> <u>Schaefer</u>, 87 F.3d at 568.  Additionally, probable cause may be found when recent information corroborates otherwise stale information.  <u>See</u> <u>Emery v. Holmes</u>, 824 F.2d 143, 149 (1st Cir. 1987), and cases cited therein.  The suspicion that earlier purchases may have been made to manufacture MDMA was corroborated by the August 2006 purchases of other MDMA precursors.  Accordingly, the eBay purchases are not too stale to be considered in the probable cause determination.

### b.  Totality of the Circumstances

As noted <u>supra</u>, the affidavit in support of the warrant request set forth the following: (1) information obtained from the RCMP regarding purchase of one-half kilogram of P-Benzoquinone in February 2005; (2) a list of purchases of chemicals and glassware made on eBay from January 2004 through August 2006; (3) Siciliano's evasive responses to questions concerning his identity and whether others were in the apartment; (4) the gel capsules and powder viewed during the protective sweep; (5)

Siciliano's responses to Roberto's questions concerning his purchase of chemicals; (6) Siciliano's overheard telephone conversation in which he stated that he had done something stupid and ordered chemicals; and (7) Siciliano's evasive and agitated demeanor. Whether the affidavit sufficiently establishes probable cause even after the exclusion of the gel capsules and powder is a close question.[8]

The purchase <u>in a single order</u> of all the requisite chemicals needed to manufacture illicit drugs "is a 'red flag' fact which arouses suspicion, although not necessarily establishing probable cause." United States v. Drake, 673 F.2d 15, 18 (1st Cir. 1982) (noting that "a strong inference" that the chemicals are being combined "arises from the fact that they were obtained at the same time"). Here, the precursor chemicals were obtained over a two and one-half year period, reducing the inference that they were being combined to manufacture MDMA. By themselves, the purchases would be insufficient to establish probable cause. However, Siciliano's statements – the evasive and false statements to Roberto and the statement on the telephone that he had done something "stupid" and ordered chemicals – strengthened the officers' appraisal that Siciliano had committed a crime. Probable cause "demands no more than a proper assessment of probabilities in particular factual contexts." Illinois v. Rodriguez, 497 U.S. 177, 184 (1990) (internal quotation marks and citation omitted). "Probability [of criminal activity] is the touchstone: probability, and not a prima facie showing, of criminal activity is the standard of probable cause." United States v.

---

[8] I also exclude from consideration the erroneous information in the affidavit regarding purchase of one-half kilogram of P-Benzoquinone in February 2005. (See supra note 5.)

16

Figueroa, 818 F.2d 1020, 1023-24 (1st Cir. 1987) (quoting Gates, 462 U.S. at 235). Considering the totality of the circumstances, the affidavit sufficiently establishes probable cause to support the search warrant even after the tainted information is excised.

### 2. Request for Warrant

The second prong of the Dessesaure test requires the court to determine whether the officers would have sought the warrant even if they had not known, as a result of the protective sweep, that gel capsules and white powder were present inside the apartment. See Dessesaure, 429 F.3d at 369. "In making the factual determination as to the police officers' intent, the district court is not bound by after-the-fact assurances of their intent, but instead must assess the totality of the attendant circumstances to ascertain whether those assurances appear 'implausible.'" Id., citing Murray, 487 U.S. at 540 n.2. Siciliano's evasive and inconsistent answers likely raised the officers' suspicions that he was somehow involved in wrongdoing. Nonetheless, in the weeks before November 16, 2006, the officers had surveilled Siciliano and gone through his garbage without observing anything indicative of criminal activity. The gel capsules and powder were the only concrete indication that the previously-delivered chemicals might still be on the premises. Moreover, both Roberto and DiTulio testified that it was the combination of Siciliano's statements and the items observed during the protective sweep that led them to seek the search warrant. Under these circumstances, the government has not established that the officers would have sought the warrant absent the knowledge that gel capsules and powder were in the apartment.

Accordingly, the November 16, 2006, warrant to search 85 Surrey Street is invalid and all items seized pursuant to that warrant are suppressed.

### D. The March 2007 Warrants

To the extent defendant complains of the deliberate opening and printing of one file each from N16 and N17 in support of the March 29, 2007, warrant application, I find that the images would inevitably have been discovered.  Mossman testified that she would have reviewed every single file on both N16 and N17 during the course of her examination pursuant to the March 9, 2007, warrant's broad definition of "data," which includes "all information stored on storage media of any form (such as documents, tables, metadata, audio and visual files, their drafts and their modifications, whether deliberately, inadvertently, or automatically stored)."  (Ex. 19, Attach. B.)  Additionally, although she deliberately compared the hash values of the files on N16 and N17 with the "Innocent Images" set, it is DEA protocol to run this comparison when examining a hard drive, and Mossman testified that she does so in every case pursuant to that protocol.  The court credits her testimony in full.  Accordingly, the prosecution has "establish[ed] by a preponderance of the evidence that the [files] ultimately or inevitably would have been discovered by lawful means" had the initial seizure of the computers been lawful.  Nix v. Williams, 467 U.S. 431, 442-43 (1984); see also United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986).

However, "the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree.  It extends as well to

the indirect as the direct products of unconstitutional conduct." Segura v. United States, 468 U.S. 796, 804 (1984) (internal quotation marks and citations omitted).  The two computers and jump drive were seized from 85 Surrey Street pursuant to the November 16, 2006, warrant, and the pornographic images recovered from them were not "come at . . . by means sufficiently distinguishable to be purged of the primary taint."  Id., quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963).  Accordingly, they must also be suppressed.

## III. Conclusion

Defendant's motion to suppress (Docket # 15) is ALLOWED.

|      March 14, 2008      |      /s/Rya W. Zobel      |
|---|---|
| DATE | RYA W. ZOBEL<br>UNITED STATES DISTRICT JUDGE |